UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ESTELLE NUCATOLA,

                Plaintiff,

        -against-

EASTPORT-SOUTH MANOR CENTRAL
SCHOOL DISTRICT, and
EASTPORT-SOUTH MANOR CENTRAL SCHOOL
DISTRICT BOARD OF EDUCATION

               Defendants.
----------------------------------------------------------------X

**COMPLAINT**

*Jury Trial Demanded*

      Plaintiff ESTELLE NUCATOLA, by and through her attorneys, TILTON BELDNER LLP respectfully alleges, upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     In 2003, Plaintiff Estelle Nucatola began working for the Eastport-South Manor Central School District as a Clerk Typist. Over the course of her employment throughout the District, Plaintiff proved herself to be a hard-working, dependable and professional employee.

2.     In 2012, Ms. Nucatola began working in the District's Facilities Department, under the direct supervision of Plant Facilities Administrator Ron Ryan. From August 2012 to December 2013, Mr. Ryan continuously subjected Plaintiff to a hostile work environment based on her gender and religion. During this time period, Mr. Ryan made sexually explicit remarks to Plaintiff, and about women on a regular

basis. For example, among other things, Mr. Ryan: (1) talked about his sexual exploits; (2) asked Plaintiff if she was wearing underwear; (3) made humping motions; and (4) enacted sexually inappropriate motions with bananas.  In addition, Mr. Ryan made wildly inappropriate comments about Jews, commenting that Jews were cheap, and even implying that six millions Jews did not die in the Holocaust.

3.      In December 2013, Plaintiff filed an internal complaint of harassment and discrimination with the District. Following an investigation, the District determined that Mr. Ryan had indeed harassed Plaintiff on the basis of her gender and religion. Incredibly, however, Mr. Ryan was not formally disciplined by the District. Instead, the District's Assistant Superintendent suggested that Plaintiff was "too sensitive," and warned that she was not to discuss her complaint of harassment with anyone else within the District.

4.      Following Plaintiff's internal complaint of harassment, and the filing of a charge of discrimination with the New York State Division of Human Rights, Defendants systematically retaliated against Ms. Nucatola. She was stripped of all of her primary responsibilities, given onerous restrictions regarding her job, and completely isolated and ostracized by the District office. Defendants' campaign of retaliation culminated in the filing of disciplinary charges, which resulted in Plaintiff's termination of employment.

5.     As more fully set forth below, Defendants intentionally targeted, harassed, and subjected Plaintiff to a hostile work environment on the basis of her gender, religion, and because of her good faith opposition to discriminatory practices. Defendants further discriminated and retaliated against Plaintiff by bringing disciplinary charges, suspending, and eventually terminating her from employment. Defendants' aforementioned conduct is in clear violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human Rights Law, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendants.

7.     Venue is proper in this case pursuant to 28 U.S.C. § 1391 because: (1) the Defendants are located in Suffolk County, New York, which is located in the Eastern District of New York, and (2) the events which give rise to the Plaintiff's claims took place in Suffolk County, which is located in the Eastern District of New York.

8.      All conditions precedent to filing suit have been fulfilled. On or about July 2, 2015, Plaintiff filed a timely Charge of Discrimination with the United Stated States Equal Opportunity Commission ("EEOC"). The Charge of Discrimination was cross-filed with the New York State Division of Human Rights. On or about October 27, 2015, Plaintiff filed an Amended Charge of Discrimination with the EEOC. On or about April 1, 2016, the EEOC issued Plaintiff a Notice of Right to Sue. Annexed hereto, and hereby incorporated into this Complaint, as Exhibit A, is a copy of Plaintiff's Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of the Right to Sue Notice.

9.      In addition, on or about June 2, 2015, Plaintiff served a timely Notice of Claim upon Defendants. On July 14 and July 27, 2015, counsel for Defendants conducted a pre-hearing deposition of Ms. Nucatola, pursuant to General Municipal Law § 50. On or about October 27, 2015, Plaintiff served a timely Amended Notice of Claim upon Defendants.

**PARTIES**

10.      Plaintiff ESTELLE NUCATOLA is a 57-year old female, who is a resident and domiciliary of Suffolk County, NY. At all times relevant to this charge, Ms. Nucatola was an "employee" of Defendants, as that term is defined by Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.) ("Title VII") and New York State Human Rights Law (New York State Exec. Law §§ 290 et seq.)

11.     Defendant EASTPORT-SOUTH MANOR CENTRAL SCHOOL DISTRICT ("the District") is a school district located at 149 Dayton Avenue, Manorville, NY 11949. At all times relevant to this complaint, Defendant was Ms. Nucatola's "employer," as that term is defined by Title VII, and New York State Human Rights Law.

12.     Defendant EASTPORT-SOUTH MANOR CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION ("the Board"), at all times hereinafter mentioned, was and still is a municipal corporation incorporated under and by virtue of the laws of the State of New York, with its principal place of business located at 149 Dayton Avenue, Manorville, NY 11949. At all times relevant to this complaint, the Board was Plaintiff's "employer," as that term as that term is defined by Title VII, and New York State Human Rights Law.

## FACTUAL ALLEGATIONS

### *Background*

13.     In 2003, Plaintiff Estelle Nucatola began working for Defendants as a Clerk-Typist. Plaintiff's position is a competitive civil service position. Initially, upon her hiring, Plaintiff was assigned to work in the District's Junior-Senior High School, where she reported to Assistant Principal Frank Pannissi.

14.     As a Clerk-Typist, Plaintiff proved herself to be a hard-working, competent and professional employee. Ms. Nucatola worked at the Junior-Senior High School for approximately two and a half years. In this role, Plaintiff was responsible for,

among other things, collecting money and student records for Advanced Placement ("AP") testing, ensuring that students received appropriate home instruction, and securing adequate substitute coverage for absent teachers. During this time, she was never subject to discipline of any kind, and she received no complaints regarding her performance. Indeed, all feedback that she received regarding her performance was positive.

15. In or around 2005, Plaintiff requested a transfer to the District's Special Education Department. In this role, Plaintiff was responsible for ensuring that special education students received their Individualized Education Programs ("IEPs"), setting up testing for special education students, and assisting the Director of Special Education with administrative tasks.

16. Again, while she was assigned to the Special Education Department, Ms. Nucatola received praise from her supervisors and colleagues regarding her performance. Over the course of the four years she worked in the Special Education Department, Plaintiff was not subject to discipline of any kind.

17. In or around 2009, Plaintiff applied for, and was awarded a position in the District's Chairperson office. In this position, Ms. Nucatola worked for each of the District's Department Heads, and reported to Assistant Principal Brian O'Sullivan.

18.     In this position, Plaintiff's responsibilities included organizing Regents exams and assessments for students in grades 7-12, and ensuring that students were properly receiving Academic Intervention Services ("AIS").

19.     Each day, Ms. Nucatola also covered for the Attendance Clerk Typist who was assigned to the Junior-Senior High School when that individual went to lunch. Plaintiff was not subjected to discipline of any kind in this role, and received no complaints regarding her work performance.

20.     At the conclusion of the 2010-2011 school year, Ms. Nucatola requested a transfer from the Chairperson office. Thereafter, in August 2011, Plaintiff was transferred to the District Office.

21.     In this role, Ms. Nucatola reported directly to Superintendent Mark Nocero, and Assistant Superintendent for Business Richard Snyder. Plaintiff's responsibilities included answering the District Office phone, entering attendance records into the District's computer database, greeting individuals who visited the District Office, drafting sex offender letters, and putting signs together for upcoming events in the District. In addition, Plaintiff was responsible for drafting the District's "Friday Update" report which was submitted each week to the Board of Education.

22.     Ms. Nucatola also trained the Superintendent's secretary, Ms. Colleen Bowler. Plaintiff worked in this position from August 2011 to August 2012. During this

time period, Plaintiff was not subject to discipline of any kind, and all feedback regarding her work performance was positive.

### *Discrimination/Hostile Work Environment*

23.     In August 2012, Plaintiff was transferred to the District's Facilities Department. This transfer was necessitated following the District's decision to transfer secretary Jamie Brosnan from the Facilities Department.

24.     In her new role, Ms. Nucatola reported directly to the District's Plant Facilities Administrator – Ron Ryan. Almost immediately upon being transferred, Mr. Ryan subjected Plaintiff to a hostile work environment on the basis of her gender and religion.

25.     For example, in the very first week of August 2012, Mr. Ryan, while sitting behind Plaintiff, loudly asked several female individuals who were present in the office whether they were "wearing any underwear." About one week later, Mr. Ryan asked Plaintiff whether *she* was wearing any underwear. Shocked, Plaintiff said nothing and left Mr. Ryan's office.

26.     About a month later, in September 2012, Plaintiff was wearing white pants. Mr. Ryan turned to Ms. Nucatola and remarked, "I love a woman in white pants." This remark, understandably, made Ms. Nucatola feel extraordinarily uncomfortable.

Over the course of the next twelve months, Mr. Ryan repeated the "white pants," and "underwear" comments on numerous occasions while in Plaintiff's presence.

27. Mr. Ryan continued to make sexually inappropriate remarks to, and in front of Plaintiff from September 2012 to February 2013.

28. For example, during the Winter of the 2012-13 school year, Mr. Ryan began making offensive, and overtly sexual gestures on a regular basis with his body. Specifically, Mr. Ryan would make "humping motions." Mr. Ryan also utilized bananas to further make inappropriate sexual gestures. Mr. Ryan stroked bananas in a sexual manner, and place bananas under his clothing to make it appear as if they were his penis.

29. In February 2013, following the February break, Mr. Ryan decided to speak to Plaintiff about his sex life. Specifically, unprompted, Mr. Ryan told Ms. Nucatola that while his kids were in school during the February break (on days they were required to make up following Hurricane Sandy), he and his wife had sex. At no time did Plaintiff say or do anything that would even suggest that it was appropriate for Mr. Ryan to speak about his sex life.

30. Additionally, in the Spring of 2013, Mr. Ryan told Plaintiff that he walked around his house naked.

31.     In the Summer of 2013, Mr. Ryan continued his unabated comments about women in white pants. Likewise, Mr. Ryan frequently asked females if they were wearing underwear while in Ms. Nucatola's presence. These comments continued, on a regular basis, from May 2013 to October 2013.

32.     Mr. Ryan's inappropriate and offensive comments, however, were not limited to those of a sexual nature. Rather, he continuously made insulting remarks about Jews. For example, on one occasion, a Jewish individual, Russ Cohen came in to speak to Mr. Ryan. When Mr. Cohen left the office, Ms. Nucatola said that he was a very nice man. Mr. Ryan responded by saying, "yes, but he is a Jew."

33.     On another occasion, in the Winter of the 2012-13 school year, a Jewish individual named Ian Kessler called the office. When Plaintiff relayed the message, Mr. Ryan said "what does that Jew want?"

34.     In or around March 2013, a Jewish individual named Mike Liebermann called the office looking for a key. Mr. Ryan then began speaking about Mr. Liebermann in an angry tone, and referring to "Jews."

35.     On another occasion in 2013, Mr. Ryan told Plaintiff that his mother would often say "how come there are so many Jews if they claim six million were killed in the Holocaust."

36.    Mr. Ryan's inappropriate, demeaning, and insulting comments about Jews continued through the Fall of 2013.

37.    Mr. Ryan also made other degrading and harassing comments to, and about Ms. Nucatola. On one occasion in or around May 2013, Mr. Ryan told Plaintiff that she was "bipolar," in an aggressive and abrasive tone. Mr. Ryan also told Ms. Nucatola that she was a "phony," and made other demeaning and ridiculing comments which were clearly intended to make her feel stupid and incompetent. In addition, Mr. Ryan would often yell at Ms. Nucatola in front of others.

### The District Investigates Plaintiff's Complaint of Harassment

38.    The endless barrage of insulting comments and verbal abuse caused Plaintiff significant stress in the workplace, and made her very uncomfortable. Finally, on or about December 16, 2013, Ms. Nucatola filed an internal complaint of harassment with Assistant Superintendent of Personnel Linda Anne Weiss. An investigation was conducted, and several witnesses confirmed Plaintiff's allegations regarding Mr. Ryan.

39.    For example, Ms. Sharon Murray stated that Mr. Ryan was "a pig," who "always makes sexual comments." According to Ms. Murray, Mr. Ryan would often ask females if they were wearing underwear, and would say "I'm watching you on the cameras."

40.     Ms. Christine Inzerillo also confirmed Ms. Nucatola's complaints were accurate. Specifically, Ms. Inzerillo told Ms. Weiss that Mr. Ryan made "numerous sexual comments about women in the office."

41.     In particular, according to Ms. Inzerillo, Mr. Ryan would often state, "she isn't wearing any underwear," "you can see through her pants," and "she has quite a rack." Ms. Inzerillo also confirmed the frequency of Mr. Ryan's degrading remarks regarding Jewish individuals.

42.     On January 17, 2014, Assistant Superintendent Weiss issued an Investigative Report, which contained the District's findings. The District concluded that "Nucatola's complaint that she was harassed by Ryan on the basis of her gender and/or religion in violation of District policy *has merit.*" In particular, Assistant Superintendent Weiss concluded that "harassment occurred insofar as Ryan made harassing remarks of a sexual nature and harassing remarks which were derogatory towards Jewish individuals. These remarks were inappropriate and violated District policy."

43.     Following its finding that Mr. Ryan had engaged in sexual harassment, and had harassed Plaintiff on the basis of her Jewish religion, the District failed to issue Mr. Ryan formal disciplinary charges.

44. In fact, Mr. Ryan was not formally disciplined at all. Instead, he received a "counseling memorandum" which was placed in his personnel file. The memorandum, however, clearly states "this memorandum should not be construed as a formal accusation, charge, or formal disciplinary action."

### *Retaliation*

45. In December 2013, Ms. Nucatola was transferred from the Facilities Office to the District Office, where she received restrictions from that no other Clerk-Typist in that position was subjected to.

46. In particular, Plaintiff was told that she was not permitted to leave her desk, for any reason, unless she had coverage from another individual. Thus, Ms. Nucatola was prohibited from even going to the restroom unless she found another typist to cover the desk. The clerk typist who had worked in the position immediately prior to Plaintiff, and who had not filed a complaint of harassment, was not subject to these onerous restrictions.

47. Notably, in early January 2014, just days before completing the District's official investigative findings, Assistant Superintendent Weiss called Ms. Nucatola to a meeting, wherein she suggested that Plaintiff was "too sensitive," and that Mr. Ryan's conduct was not truly "sexual harassment" because Ms. Nucatola waited too long before filing her complaint. Shockingly, Ms. Weiss also accused Ms. Nucatola, in filing her harassment complaint, of somehow retaliating against Mr.

Ryan. Ms. Weiss warned Plaintiff "not to speak a word of this to anyone in the District."

48.    On February 12, 2014, Ms. Nucatola filed a complaint of discrimination and retaliation with the New York State Division of Human Rights. The Division of Human Rights Complaint (Charge No. 10167215). The charge was cross-filed with the EEOC (Charge No. 16G-2014-01804.)

49.    Almost immediately following the filing of Ms. Nucatola's complaints of discrimination with the DHR and EEOC, the District retaliated against Plaintiff.

50.    On March 7, 2014, less than one month after Ms. Nucatola filed her DHR Complaint Defendants stripped Plaintiff of her "Friday Update" responsibilities. Ms. Weiss simply told Plaintiff, "you're not doing it anymore."

51.    In addition, on or about March 7, 2014, Defendants removed the Superintendent's phone extension from Plaintiff's desk. Prior to that date, Ms. Nucatola was the Superintendent secretary's "back-up."

52.    Further, on March 7, 2014, Plaintiff was told that she was no longer permitted to connect the intercom system to the front door bell when she was using the restroom. Prior to that date, and prior to her filing the DHR Complaint, Ms. Weiss had allowed Ms. Nucatola to connect the buzzer to the intercom system so that other

secretaries could hear the bell if Plaintiff happened to be in the bathroom at the time.

53.    A few weeks later, in April 2014, Ms. Nucatola's attendance responsibilities were removed from her desk. Prior to that, Plaintiff had the time-keeping software on her computer. As such, District employees would often call her and ask about their time accruals. Once the software was removed from her computer, Plaintiff was no longer able to provide any information to staff, and they eventually stopped calling her.

54.    In short, after filing her complaints of harassment and discrimination, Ms. Nucatola was stripped of all of her primary responsibilities, and was forced to sit at her desk all day, every day, with nothing to do. Ms. Nucatola asked Ms. Weiss on numerous occasions for clerical work to do, which would not necessitate her leaving the desk. These efforts, however, were unsuccessful.

55.    Eventually, after several months, Ms. Weiss designated Jamie Brosnan as the individual that Ms. Nucatola was required to ask for coverage, should she need to use the restroom, or if she wanted to take a lunch break. Ms. Brosnan, however, was Mr. Ryan's secretary. Thus, every time Ms. Nucatola wanted to leave her desk to use the bathroom, it was necessary for her to first obtain permission from her former supervisor; a man who had harassed, bullied, and now openly despised her.

56.     Ms. Brosnan, as Mr. Ryan's secretary, also exhibited clear hostility towards Ms.
        Nucatola following her complaints about Mr. Ryan. Ms. Brosnan often made
        degrading and demeaning remarks regarding Plaintiff to others, and would refer to
        Plaintiff using profanity. When Ms. Nucatola would ask Ms. Brosnan for coverage
        so that she could use the restroom, as directed by Ms. Weiss, she was regularly
        greeted with nasty, hostile, and intimidating looks by Brosnan.

57.     Upon information and belief, at the behest of Mr. Ryan and Ms. Brosnan, other
        personnel in the office began ignoring and avoiding Ms. Nucatola. Several staff
        members who were friendly with Ms. Nucatola prior to her discrimination
        complaints, would no longer speak to her and even avoided eye contact.

58.     Throughout 2014, Plaintiff was completely ostracized by the rest of the office, and
        was treated as if she was a prisoner of her desk. Ms. Nucatola complained about
        the continued harassment, lack of responsibilities, and complete isolation on several
        occasions. Specifically, she complained to Assistant Superintendent Weiss via
        email and in person. Her complaints of maltreatment, however, fell on deaf ears.

59.     Ms. Nucatola was being treated: (a) substantially worse than every other clerk typist
        in the District; (b) substantially worse than she was treated prior to filing complaints
        of discrimination; and (c) substantially worse than all of the other employees at the
        District office who did not file complaints of discrimination. No remedial action

was ever taken on her behalf. Desperate for work, Plaintiff pleaded for tasks and assignments to do. Her repeated requests were largely ignored.

60.    This retaliatory harassment continued throughout the 2014-2015 school year.  In October 2014, Plaintiff asked Ms. Weiss for a transfer. In response, Ms. Weiss inexplicably referenced Ms. Nucatola's Division of Human Rights Complaint. Plaintiff's request to be transferred was denied. Plaintiff asked for the restrictions on her ability to leave her desk to be lifted. This request was also denied.

61.    On January 30, 2015, Ms. Nucatola emailed Human Resources and asked to meet with them to discuss her situation, which was causing her significant emotional distress. She did not receive a response.

62.    On February 11, 2015, Ms. Nucatola again emailed Human Resources and asked for an opportunity to meet. Again, she did not receive a response.

63.    After more than a year of being continuously harassed, ostracized, and isolated, Plaintiff finally succumbed to the severe stress and anxiety that she was suffering from, and emotionally broke down while at her desk. She began crying, and expressed to a co-worker how upset she felt at the way she had been continuously mistreated during the prior fourteen months.

64.     On the following day, February 12, 2015, Ms. Nucatola called out sick. On February 13, 2015, Plaintiff was told not to punch-in, but rather, to report directly to the conference room in the District office. Rather than inquire as to Ms. Nucatola's emotional well-being, Defendants informed Plaintiff that she was suspended until the District's next Board meeting.

65.     Several weeks later, on March 3, 2015, Defendant served Ms. Nucatola with Article 75 disciplinary charges, seeking the termination of her employment. The charges, were based on fabricated and exaggerated accounts of Ms. Nucatola's emotional breakdown, represented a transparent attempt to further punish and retaliate against Plaintiff.

66.     Notably, in the spring of 2014, a male teacher at the District had an emotional breakdown at work that was much more significant than Plaintiff's. While teaching an eighth grade class at Eastport-South Manor Junior High School, the teacher began yelling, cursing, and throwing chairs. Many students ran out of the class in fear of their safety.

67.     Following the frightening incident, which placed students' safety in jeopardy, the male teacher was not brought up on disciplinary charges. Upon information and belief, unlike Plaintiff, the eighth grade teacher did not file any charges or complaints of discrimination against the District prior to his emotional breakdown and outburst.

68.     Given that Plaintiff's work performance was always stellar, Ms. Nucatola's emotional breakdown, which was caused by Defendants' harassment and hostility, represented the District's first opportunity to remove her from her position following her complaints of discrimination. Defendants seized this opportunity, and brought spurious disciplinary charges in furtherance of their goal of destroying Plaintiff's personal and professional reputation, and terminating her employment.

69.     On or about September 9, 2015, Defendant terminated Ms. Nucatola from employment, after more than twelve years of loyal and dedicated service. The decision to terminate Plaintiff from employment constitutes further retaliation for her good faith opposition to discriminatory practices.

## CLAIMS FOR RELIEF

70.     Based on the foregoing, in subjecting Plaintiff to a hostile work environment on the basis of her gender and religion, Defendants discriminated against Plaintiff, in violation of Title VII, New York State Human Rights Law, and the Equal Protection Clause to the Fourteenth Amendment to the U.S. Constitution.

71.     Based on the foregoing, in retaliating against Plaintiff because of her good faith opposition to discriminatory practices, which eventually culminated in her termination, Defendants violated Title VII, New York State Human Rights Law, and the Equal Protection Clause to the Fourteenth Amendment to the U.S. Constitution.

72.     Defendants intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights.  Such deliberate indifference may be inferred in the following ways:

    i.      Defendant's custom or practice of discriminating against Plaintiff based on her gender and religion. The discriminatory practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers.

    ii.     Inadequate training/supervision was so likely to result in the discrimination that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision.

    iii.    Supervisors failed to properly investigate and address allegations of discrimination.

    iv.     Policymakers engaged in and/or tacitly condoned the discrimination.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants for all compensatory, emotional, psychological and punitive damages, lost compensation, front pay, back pay, liquidated damage, injunctive relief,  and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that the Court grant the Plaintiff any other relief to which he is entitled, including but not limited to:

1.      Awarding reasonable attorneys fees and the costs and disbursements of this action;

2.      Granting such other and further relief that to the Court seems just and

proper.

**Further,** Plaintiff demands a trial by jury.

Dated:  Uniondale, New York
        May 16, 2016

                                              **TILTON BELDNER LLP**
                                              626 RXR Plaza
                                              Uniondale, NY 11556
                                              P: (516) 262-3602
                                              F: (516) 324-3170

                                              Joshua Beldner

# EXHIBIT A



U.S. Department of Justice
Civil Rights Division

CERTIFIED MAIL
7003 0500 0002 5057 9982

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

April 01, 2016

Ms. Estelle C. Nucatola
c/o Joshua Beldner, Esquire
Law Offices of Tilton & Beldner
626 RXR Plaza
Uniondale, NY 11556

Re: EEOC Charge Against Eastport-South Manor Central School Dist., et al.
    No. 520201502913

Dear Ms. Nucatola:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC New York District Office, New York, NY.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Vanita Gupta
Principal Deputy Assistant Attorney General
Civil Rights Division

by *Karen L. Ferguson*
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: New York District Office, EEOC
   Eastport-South Manor Central School Dist., et al.